UNITED STATES DISTRICT COURT

DISTRICT OF ALASKA

BRYAN BELGROVE,

        Plaintiff,

        vs.

NORTH SLOPE BOROUGH POWER, LIGHT, AND PUBLIC WORKS

        Defendant.

3:12-CV-00178 JWS

ORDER AND OPINION

[Re: Motions at docket 46, 61]

## I. MOTIONS PRESENTED

At docket 46, Plaintiff Bryan Belgrove ("Belgrove") filed a motion for partial summary judgment as to his state law claim for wrongful discharge in breach of the covenant of good faith and fair dealing. Defendant North Slope Borough Power, Light, and Public Works ("the Borough" or "Public Works") responded at docket 60 and crossed moved for summary judgment as to all of Belgrove's claims at docket 61. Its memorandum and evidence in support is at docket 62. Belgrove's reply is at docket 88, and his response in opposition to the Borough's cross-motion is at docket 89. The Borough's reply is at docket 90. Belgrove filed an additional reply at docket 91. Oral argument was heard on October 2, 2013.

## II. BACKGROUND

Belgrove was hired as an apprentice lineman for Public Works in January 2011. He had probationary status during the first six months of his employment.[1] As an apprentice lineman, Belgrove worked under the supervision of a journeyman lineman.[2] A critical aspect of his position as an apprentice lineman was to take direction from more senior linemen.[3] During the initial months on the job, Belgrove's supervisor, Clark Williams, developed concerns about Belgrove's job performance, including his ability to get along with others and listen to directions.[4] During his probationary period, Belgrove had a verbal altercation with another lineman, Perry Welch, while working in Point Hope Alaska, causing a disturbance in the community.[5] Belgrove reported to his supervisors and Public Works management that Welch had threatened him.[6] On April 19, 2011, the Borough released both Belgrove and Welch from their probationary employment based on inadequate performance and poor attitude.[7]

Shortly after Belgrove's release, the Borough learned that an administrative mistake had been made so that Belgrove and another apprentice lineman hired in January of 2011 had not been properly registered as apprentices with the state. In light of the mistakes, the Borough decided to reinstate Belgrove to his former position starting in the beginning of May with back pay for all days missed.[8] Shortly after

---

[1] Ex. C.

[2] Belgrove depo. at pp. 33-34; Ex. E.

[3] Ahgeak aff. at ¶ 5; Bagienski dec. at ¶ 2.

[4] Williams aff. at ¶¶ 2-3; Exs. G, H.

[5] Grinage aff. at ¶ 3.

[6] Grinage aff. at ¶ 3.

[7] Grinage aff.; Ex. J.

[8] Grinage aff. at ¶ 4.

1  Belgrove's return to the job, Jason Bagienski became lead lineman and Belgrove's
2  immediate supervisor.[9]

3  Belgrove continued to have problems with his performance. His coworkers
4  expressed concerns about working with him. They complained that he talked on the
5  phone too much.[10] They complained that he was argumentative and could not follow
6  the proper chain of command or instructions.[11] For example, an electrician for Public
7  Works, Doug Aldred, stated that Belgrove refused to work through lunch during an
8  emergency power outage in dereliction of his duties.[12] Aldred had such a difficult time
9  working with Belgrove, he informed Bagienski that he would no longer work with him.[13]
10 Belgrove's coworkers said that Belgrove made threats against them and was overly
11 argumentative.[14] For example, one coworker, Kris Kolodziej reported that he witnessed
12 Belgrove becoming upset with the other apprentice lineman over dishes at mealtime,
13 and later that night Belgrove told Kolodziej that he knew people who could beat up the
14 other apprentice when they went to California for apprentice training.[15] In light of these
15 complaints, on July 20, 2011, Bagienski went to the Borough's human resources
16 department to discuss how to address Belgrove's performance problems.[16] He drafted

---

[9] Bagienski dec. at ¶ 2.

[10] Bagienski dec. at ¶ 3 ; Kolodziej aff. at ¶ 5; Aldred aff. at ¶ 2; Exs. L M, Q.

[11] Bagienski dec. at ¶¶ 6-7; Williams aff. at ¶¶ 7-8; Kolodziej aff. at ¶¶ 2, 4; Aldred aff. at ¶ 2.; Exs. L, M, N.

[12] Aldred aff. at ¶ 3; Ex. E.

[13] Aldred aff. at ¶ 4.

[14] Williams aff. at ¶ 8; Kolodziej aff. at ¶¶ 3, 7.

[15] Kolodziej aff. at ¶ 2.

[16] Bagienski aff. at ¶ 9.

an evaluation of Belgrove, documenting the complaints and concerns Belgrove's coworkers had about working with him.[17]

During the training course in California, Belgrove had performance problems. Belgrove did not pass two of his academic courses and failed to turn in homework.[18] His instructor determined that he needed to improve his practical skills and also said that he seemed to have his mind somewhere else and did not adequately study.[19] The instructor's behavioral assessment concluded that Belgrove's attitude did not meet expectations.[20]

Shortly after Belgrove's return from training, on August 10, 2011, Belgrove brought a gun to work to sell to a coworker. This upset some of the lineman given the past concerns they had about Belgrove being argumentative and making threats.[21] On that day Bagienski had a meeting with the Public Works management at that time: Assistant Deputy Director Chris Dunbar, Deputy Director Harold Snowball, and Director Ken Grinage.[22] The management team decided to place Belgrove on investigative leave from August 12 to August 26.[23] The Borough then issued Belgrove a notice of contemplated discharge, setting forth its basis for termination.[24] Belgrove and Bagienski met to discuss the contemplated discharge and to allow Belgrove to respond

---

[17] Ex. N.

[18] Ex. P at p. 2.

[19] Ex. P at pp. 2-3.

[20] Ex. P. at p. 5.

[21] Bagienski dec. at ¶ 12.

[22] Bagienski dec. at ¶ 12; Dunbar aff. at ¶ 4; Ex. R.

[23] Dunbar aff. at ¶ 4; Grinage aff. at ¶ 5.; Exs. R, T.

[24] Ex. V.

to the allegations against him.[25] After the meeting, Bagienski recommended that management discharge Belgrove based on personality conflicts and job performance.[26] Belgrove was informed that a pre-disciplinary hearing with the then-director of Public Works, Grinage, was scheduled for August 26 where Belgrove would be able to present evidence in his defense.[27] Grinage conducted the meeting and Dunbar, the assistant deputy director at that time, was also present.[28] At the meeting, Belgrove generally denied all the of the allegations against him, but he did not provide an explanation regarding any of the specific allegations or provide evidence in his defense.[29] He alleged that his coworkers were aligning to get him fired, but he did not mention any incidents of discrimination.[30] Grinage determined that termination was appropriate, and discharged Belgrove from service on August 29.[31] Belgrove was informed he could appeal. Belgrove did not, but instead filed complaints with both the Alaska State Commission for Human Rights ("the Human Rights Commission") and the Equal Employment Opportunity Commission ("the EEOC"). He later discharged his Human Rights Commission complaint.[32] As for his EEOC complaint, the EEOC determined that

---

[25] Ex. W; Bagienski dec. at ¶ 12.

[26] Ex. W; Bagienski dec. at ¶¶ 12, 13.

[27] Ex. X; Grinage aff. at ¶ 6.

[28] Grinage aff. at ¶ 6; Dunbar aff. at ¶ 5.

[29] Grinage aff. at ¶¶ 6, 7; Ex. Y.

[30] Belgrove depo. at pp. 105-09, 117-18.

[31] Grinage aff. at ¶ 7; Dunbar aff. at ¶ 5; Ex. Z.

[32] Belgrove depo. at pp. 110-13.

there were insufficient facts to establish a civil rights violation.[33] As of July 2013, the Borough had not hired another apprentice lineman to replace Belgrove.[34]

Belgrove filed his complaint in state court for "the irregular and wrongful termination of a permanent employee based on cultural discrimination and racial profiling." His complaint raises three claims: 1) a discriminatory termination claim under Title VII of the Civil Rights Act of 1964 and the Alaska Human Rights Act alleging race, religion, and national origin discrimination; 2) a hostile work environment claim under Title VII; and 3) a breach of the covenant of good faith and fair dealing under state law. The Borough removed the action to federal court based upon the Title VII claims. The court has jurisdiction pursuant to 28 U.S.C. §§ 1331, 1367. Belgrove moved for summary judgment as to his state law claim. The Borough moved for summary judgment as to all three claims.

### III. STANDARD OF REVIEW

Summary judgment is appropriate where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."[35] The materiality requirement ensures that "only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment."[36] Ultimately, "summary judgment will not lie if the . . . evidence is such that a reasonable jury could return a verdict for the nonmoving party."[37] In resolving a motion for summary judgment, a court must view the evidence in the light most

---

[33]Belgrove depo. at pp. 111-12.

[34]Bagienski dec. at ¶ 15; Belgrove depo. at p. 115.

[35]Fed. R. Civ. P. 56(a).

[36]*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

[37]*Id.*

favorable to the non-moving party.[38] The reviewing court may not weigh evidence or assess the credibility of witnesses.[39]

The moving party has the burden of showing that there is no genuine dispute as to any material fact.[40] The moving party need not present evidence; it need only point out the lack of any genuine dispute as to material fact.[41] Once the moving party has met this burden, the non-moving party must set forth evidence of specific facts showing the existence of a genuine issue for trial.[42] All evidence presented by the non-movant must be believed for purposes of summary judgment and all justifiable inferences must be drawn in favor of the non-movant.[43] However, the non-moving party may not rest upon mere allegations or denials, but must show that there is sufficient evidence supporting the claimed factual dispute to require a fact-finder to resolve the parties' differing versions of the truth at trial.[44]

## IV. DISCUSSION

**A. Discriminatory Discharge**

One of Belgrove's claims for relief is that the Borough terminated him because of his race and national origin in violation of Title VII and the Alaska Human Rights Act. The borough moved for summary judgment on this claim, arguing there is no evidence to establish that Belgrove's termination was based on anything but inadequate performance as a lineman. To defeat a motion for summary judgment on both his state

---

[38]*Lopez v. Smith*, 203 F.3d 1122, 1131 (9th Cir. 2000).

[39]*Dominguez-Curry v. Nevada Transp. Dep't*, 424 F.3d 1027, 1036 (9th Cir. 2005).

[40]*Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

[41]*Id.* at 323-25.

[42]*Anderson,* 477 U.S. at 248-49.

[43]*Id.* at 255.

[44]*Id.* at 248-49.

and federal employment discrimination claims,[45] "a plaintiff may produce direct or circumstantial evidence demonstrating that a discriminatory reason more likely than not motivated the defendant's [adverse employment] decision."[46] Alternatively a plaintiff may proceed under the *McDonnell Douglas*[47] burden-shifting framework.[48]

Under the *McDonnell Douglas* framework, the plaintiff bears the burden of establishing a prima facie case of discrimination.[49] If he succeeds in doing so, the burden shifts to the defendant to articulate a legitimate, nondiscriminatory reason for the termination.[50] If the employer is successful, "the burden then shifts back to the plaintiff to raise a triable issue of fact that the defendant's proffered reason was a pretext for unlawful discrimination."[51]

Belgrove did not present any evidence or point to any evidence in the record to show that discrimination was more likely than not the reason for his termination. While Belgrove's briefing and complaint are rife with allegations of discrimination based on his race and national origin, under the summary judgment standards, Belgrove must show that there is sufficient evidence supporting the claimed factual dispute and cannot rest upon mere allegations.[52]

---

[45]The Alaska Supreme Court looks to federal law in interpreting Alaska's anti-discrimination laws and endorses the federal approach when analyzing such claims. *Era Aviation, Inc. v. Lindfors,* 17 P.3d 40, 43-44 (Alaska 2000).

[46]*Dominguez-Curry,* 424 F.3d at 1037.

[47]*McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973).

[48]*Dominguez-Curry*, 424 F.3d at 1037.

[49]*Vasquez v. Cnty. of L.A.*, 349 F.3d 634, 640 (9th Cir. 2004).

[50]*Id.*

[51]*Noyes v. Kelly Servs.*, 488 F.3d 1163, 1168 (9th Cir. 2007).

[52]*Anderson,* 477 U.S. at 248-49.

The Borough, however, submitted Belgrove's deposition in support of its motion for summary judgment, which provides some relevant evidence to consider. During his deposition Belgrove described a few specific instances where his coworkers made racist and derogatory comments. He stated that both Williams and Welch called him a "stupid nigger" sometime before April 19, 2011, and that Williams told him to "speak English."[53] These discriminatory comments, while racist and derogatory, are not direct evidence that the Borough more likely than not terminated Belgrove for discriminatory reasons, because neither Williams nor Welch were involved in the decision to terminate Belgrove in August of 2011 and there is no evidence linking these discriminatory remarks to that decision. While these comments are circumstantial evidence that Belgrove experienced discrimination in the workplace, they do not amount to substantial evidence of discriminatory motive on the part of the Public Works director who actually fired Belgrove.[54]

Unlike discriminatory animus exhibited by coworkers who were uninvolved in the decision to terminate an employee, evidence that a supervisor who exhibited discriminatory animus and who influenced or participated in the termination process is sufficient to show a triable issue of fact for the jury regarding discriminatory motive for termination.[55] Here, Belgrove stated in his deposition that Bagienski, his supervisor who influenced the decision to terminate him, asked about Belgrove's dreadlocks with an offensive expression and asked him why he did not cut off his dreadlocks.[56] He also said that Bagienski would joke about his accent in an "offhanded" way and twice told

---

[53]Belgrove depo. at pp. 35-37, 57-59, 71-72.

[54]*Coghlan v. Am. Seafoods Co. LLC*, 413 F.3d 1090, 1095 (9th Cir. 2005) ("[W]hen the plaintiff relies on circumstantial evidence, that evidence must be specific and substantial to defeat the employer's motion for summary judgment." (internal quotations omitted)).

[55]*Dominguez-Curry*, 424 F.3d at 1039-40.

[56]Belgrove depo. at pp. 79-81.

him to speak English.[57] Bagienski's comments are not direct evidence of Begienski's discriminatory animus towards Belgrove. Direct evidence is "evidence which, if believed, proves the fact [of discriminatory animus] without inference of presumption."[58] Begienski's comment about Belgrove's dreadlocks is not unambiguously discriminatory. His comments about Belgrove's accent and speaking English, while certainly offensive, are better characterized as stray comments.[59] Indeed, Belgrove alleges in his deposition that these comments were made in an "offhanded" and joking way. Bagienski's comments were not alleged to have been made in context of Belgrove's job performance or his termination and there is no other evidence linking such comments to Belgrove's termination.[60] While the comments are circumstantial evidence that Bagienski could have harbored discriminatory animus toward Belgrove, taken together they do not amount to substantial evidence of such animus or that Bagienski more likely than not initiated disciplinary proceedings against Belgrove for discriminatory reasons. This conclusion is substantially bolstered by the long history of problems with Belgrove's performance.

Belgrove does not fare better under the *McDonnell Douglas* burden shifting framework because he failed to present evidence to meet his prima facie burden. To establish a prima facie case of discrimination, a plaintiff must show: 1) he belongs to a

---

[57]*Id.* at pp. 83-85.

[58]*Goodwin v. Hunt Wesson, Inc.*, 150 F.3d 1217, 1221 (9th Cir. 1998) (internal quotations omitted).

[59]*Merrick v. Farmers Ins. Grp.*, 892 F.2d 1434, 1438 (9th Cir. 1990) ("[S]tray remarks are insufficient to establish discrimination.").

[60]*See Nesbit v. Pepsico, Inc.*, 994 F.2d 703, 705 (9th Cir. 1993) (holding that a supervisor's comment that the company does not like grey hair was not direct evidence of age discrimination but rather was merely a stray comment because it was uttered in an ambivalent manner and was not tied to the plaintiff's termination); *Marques v. Bank of Am.*, 59 F. Supp. 2d 1005, 1019 (N.D. Cal. 1999) (noting that a relevant consideration when determining whether a comment was a stray remark is whether it was "related in time and subject matter to the decisional process").

protected class; 2) he was performing according to the Borough's legitimate expectations; 3) he suffered an adverse employment action; and 4) that other employees with qualifications similar to his own outside of his protected class were treated more favorably or that his position was filled by someone outside of the protected class.[61] Belgrove did not provide affidavits or depositions from coworkers, performance evaluations, or any other evidence to show he was performing according to the Borough's expectations. Instead, the only evidence on record regarding Belgrove's job performance was submitted by the Borough and that evidence confirms that Belgrove was not meeting expectations. Belgrove also did not meet his burden to establish a prima facie case because he failed to present evidence that other employees with qualifications similar to his own outside of his protected class were treated more favorably or that his position was filled by someone outside of the protected class. Indeed, the undisputed evidence submitted by the Borough shows that Belgrove's position was not filled after his termination.[62]

Even if Belgrove were to establish a prima facie case of discrimination, the Borough met its burden of demonstrating a legitimate, nondiscriminatory reason for terminating Belgrove. His supervisors consistently rated Belgrove's performance as poor and said that he had an argumentative attitude, inappropriately used his cell phone, required constant supervision, and posed a safety risk.[63] His coworkers echoed these concerns.[64] Belgrove did not adequately perform at lineman training camp in California in July of 2011.[65] The burden shifts to Belgrove to show that the Borough's

---

[61]*Villiarimo v. Aloha Island Air, Inc.*, 281 F.3d 1054, 1062 (9th Cir. 2002); *Cornwell v. Electra Cent. Credit Union,* 439 F.3d 1018, 1028 (9th Cir. 2006).

[62]Bagienski dec. at ¶ 15.

[63]*See, e.g.,* Bagienski dec. at ¶¶ 2,3,7; Williams aff. at ¶¶ 2,5.

[64]*See, e.g.,* Aldred aff. ¶¶ 2,3 ; Kolodziej aff. ¶¶ 3,4.

[65]Ex. P.

-11-

stated reason is merely pretext for intentional discrimination. To the extent Belgrove generally alleges in his briefing that he was subjected to constant discrimination, such allegations are not enough to defeat a motion for summary judgment. Belgrove does not present any evidence to suggest a discriminatory motive behind his firing. The only specific evidence that raises an issue of discrimination is in Belgrove's deposition, submitted by the Borough, where Belgrove identified a few discriminatory comments that were made against him. As explained above, those comments are not direct evidence of discriminatory termination and do not amount to substantial circumstantial evidence of discriminatory termination.

**B. Hostile Work Environment**

Belgrove also claims that he was subjected to a hostile work environment under Title VII. To prevail on a hostile work environment claim, Belgrove must raise a triable issue of fact as to whether: (1) "he was subjected to verbal or physical conduct of a racial or sexual nature"; (2) " the conduct was unwelcome"; and (3) "the conduct was sufficiently severe or pervasive to alter the conditions of [his] employment and create an abusive work environment."[66] He must show that the work environment was both subjectively hostile and objectively hostile.[67] The borough moved for summary judgment on this claim, arguing that Belgrove cannot show severe or pervasive harassment.

To determine whether the conduct complained of was sufficiently severe or pervasive, the court looks to "all the circumstances, including the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's

---

[66]*Vasquez*, 349 F.3d at 642.

[67]*Dominguez-Curry*, 424 F.3d at 1034.

-12-

work performance."[68] Title VII, "is not a 'general civility code.'"[69] Consequently, "teasing, offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the terms and conditions of employment."[70]

Belgrove said in his deposition that he was subjected to "constant humiliation" and racist attitudes, but he only described a few specific incidents of harassment in any detail.[71] As noted above, he described an incident where his coworker Welch called him a "stupid nigger."[72] He said that Williams also directed this racist term at him one time.[73] He said that on one occasion Williams yelled at him and told him to speak English while on the job.[74] He said that Bagienski once asked about his dreadlocks with an expression Belgrove described as offensive and asked why he did not cut them.[75] He also said that Bagienski would joke about his accent and twice asked him to speak English.[76] He did not describe any further insults or incidents of humiliation.

While Belgrove asserted in his deposition that he believed he was subjected to racist attitudes in the workplace, there is not enough evidence on the record to demonstrate that Belgrove's work environment was objectively hostile. That is, there is not enough evidence to show that the discriminatory insults directed toward him were sufficiently severe, frequent, or pervasive to alter the conditions of Belgrove's

---

[68]*Vasquez*, 349 F.3d at 642.

[69]*Faraghar v. City of Boca Raton*, 524 U.S. 775, 788 (1998) (internal quotations omitted).

[70]*Manatt v. Bank of Am.,* 339 F.3d 792, 798 (9th Cir. 2003) (internal quotations omitted).

[71]Belgrove depo. at pp. 85-86.

[72]*Id.* at pp. 58-59.

[73]*Id.* at pp. 35-37.

[74]*Id.* at pp. 71-72.

[75]*Id.* at pp. 79-81.

[76]*Id.* at pp. 83-84.

employment. In *McGinest v. GTE Serv. Corp.*,[77] the plaintiff was also called a "stupid nigger." However, in that case there was additional evidence of discriminatory and hostile conduct. White workers received overtime pay, but the plaintiff did not; the plaintiff was subjected to comments such as "I'll retire before I work for a black man;" the plaintiff was told that only drug dealers could afford gold chains like the one the plaintiff wore; African American employees were referred to as "mammy" and "Aunt Jemima" in front of plaintiff; and racist graffiti was written on the walls.[78] Here, the conduct Belgrove complains about does not approach the severity, frequency, or pervasiveness of the conduct asserted in *McGinest*.

In *Mannett v. Bank of America*, the Ninth Circuit held that there was no hostile work environment where the plaintiff, an employee of Chinese descent, on several occasions overheard coworkers tell jokes using the phrase "China man" and refer to Chinese people as "communists from Beijing," and where the plaintiff's coworkers on one occasion mocked her accent in front of her and called her "China woman" and on another occasion pulled their eyes back with their fingers in an attempt to mock plaintiff's Asian appearance.[79] In *Vasquez v. County of Los Angeles*, the Ninth Circuit found that there was no hostile work environment where the employee was told that he had a "typical Hispanic Macho attitude" and that he should start working in the field because "Hispanics do good in the field."[80] The allegations in these cases are at least as severe and frequent as in this case but were nonetheless insufficiently severe or pervasive to create a hostile work environment. While "[t]here is no doubt that the term "nigger" is an invidious, demeaning, and unacceptable racial slur[,] . . . [i]t is recognized that isolated and sporadic instances in which offensive language is used, including

---

[77]360 F.3d 1103 (9th Cir. 2004).

[78]*Id.* at 1107-11.

[79]339 F.3d at 795.

[80]349 F.3d at 643.

racial epithets, are themselves insufficient to constitute a racially hostile work environment."[81] Thus, Belgrove's claim cannot survive summary judgment.

## C. Breach of the Covenant of Good Faith and Fair Dealing

Belgrove's third claim against the Borough is a state law claim for the breach of the covenant of good faith and fair dealing. Both Belgrove and the Borough move for summary judgment on this claim.

Employment contracts in Alaska include an implied covenant of good faith and fair dealing.[82] "'The covenant has both a subjective and an objective component.'"[83] An employer violates the subjective component and is in breach of the covenant when it acts with an improper motive, such as when it "discharges an employee for the purpose of depriving him or her of one of the benefits of the contract."[84] The employee cannot rely on his personal feelings about the employer's motive but rather he must present evidence that the employer's decision to terminate was in bad faith.[85]

Belgrove failed to present evidence raising a genuine issue of material fact about the Borough's subjective motive for terminating him. The evidence, even viewed in the light most favorable to Belgrove, shows that the Borough terminated Belgrove for poor performance, including his inability to work with other lineman, and not for improper subjective motives such as depriving him of an employee benefit.

An employer violates the objective component if it treats an employee in a manner that a reasonable person would deem unfair.[86] It is objectively unfair, and a

---

[81] *Cooper v. Cate*, No. 1:10-cv-899, 2012 WL 1669353, at *6 (E.D. Cal. May 11, 2012).

[82] *Smith v. Dep't of Transp.*, 253 P.3d 1233, 1238 (Alaska 2011).

[83] *Smith v. Anchorage Sch. Dist.*, 240 P.3d 834, 844 (Alaska 2010) (quoting *Mitchell v. Teck Cominco Alaska, Inc.,* 193 P.3d 751, 760 (Alaska 2008)).

[84] *Smith*, 240 P.3d at 844.

[85] *Id.*

[86] *Id.*

breach of the covenant of good faith and fair dealing, to treat similarly situated employees differently or to terminate an employee for unconstitutional reasons or for reasons that violate public policy.[87] It is also objectively unfair to terminate an employee without proper or fair procedures.[88]

Belgrove failed to present evidence raising a genuine issue of material fact as to the objective fairness of his termination. "Although the question of what a reasonable person would find to be unfair is usually a question for the trier of fact, this does not relieve [Belgrove] of the burden of presenting admissible evidence to successfully oppose a motion for summary judgment."[89] As discussed above, Belgrove did not provide any evidence to show that the Borough terminated him for discriminatory reasons or for other objectively unfair and unlawful reasons. There is no evidence that the Borough treated Belgrove differently from other employees similarly situated.

Belgrove argues that the Borough terminated him unfairly because it based his termination upon incidents that occurred during his probationary period of employment and for which the Borough did not have proper documentation to support. He argues that once his six-month probationary period expired, the Borough could only terminate him for incidents that occurred during his time as a permanent employee. Belgrove does not provide any support for his assertion that any problematic behavior or job performance must be disregarded once the probationary period expires and the Borough's policies do not support such an assertion. The difference between a probational and permanent employee is that a permanent employee can only be terminated for cause.[90] Moreover, the record shows that Belgrove had performance problems and conflicts with coworkers after his probationary period ended.

---

[87]*Id.*

[88]*Holland v. Union Oil Co. of Cal., Inc.,* 993 P.2d 1026, 1032 (Alaska 1999).

[89]*Smith*, 240 P.3d at 845.

[90]Ex. D. at p. 16.

Belgrove also asserts that the Borough failed to follow proper procedures before terminating him. The court disagrees. As for Belgrove's assertion that the Borough failed to implement progressive discipline as required by its own policies, the Borough's written policies clearly indicate that while employees are subjected to progressive discipline, "the imposition of one level of discipline shall not be construed to be a prerequisite for the imposition of any other level of discipline."[91] Discharge by the director Public Works is an appropriate level of discipline for "serious infractions" of rules governing job performance or "continued unwillingness or inability on the part of the employee to correct unacceptable actions or job performance."[92] Here, the Borough put Belgrove on investigative leave in compliance with written policies.[93] The Borough followed its written procedures for termination, providing Belgrove written notices of discharge and disciplinary hearings.[94] He had the opportunity to respond to the notices and present evidence in his defense but did not avail himself of that opportunity. Nothing about Belgrove's termination process was unfair.

Belgrove suggests in his complaint that he was terminated in bad faith because the Borough fired him in retaliation for him contacting the Department of Labor in April 2011 about the Borough's apprenticeship program. Assuming Belgrove was the reason the registration error was brought to light, Belgrove must then show a causal connection between his act of reporting and his termination.[95] The record shows that the Borough voluntarily reinstated Belgrove.[96] Belgrove does not present any evidence to dispute

---

[91] Ex. D at pp. 46-47 (§ 4.01.2).

[92] Ex. D. at p. 48 (§ 4.01.4(G)).

[93] Ex. D. at p. 47 (§ 4.01.3).

[94] Ex. D. at pp. 52-53 (§ 4.01.9).

[95] *Derendinger v. Kiewit Constr. Co.*, 272 F. Supp. 2d 850, 854-60 (D. Alaska 2003) (granting employer's motion for summary judgment on a retaliatory discharge claim).

[96] Grinage aff. at ¶ 4.

this fact or to prove that the Department of Labor forced the Borough to reinstate Belgrove. To argue that the Borough voluntarily hired Belgrove back after Belgrove reported the apprenticeship program to the Department of Labor only to fire him four months later in retaliation is an untenable position. Belgrove presents no other evidence to suggest his termination was linked to the fact that he brought to light the Borough's registration error.

## V. CONCLUSION

Based on the preceding discussion, Belgrove's motion for partial summary judgment at docket 46 is DENIED and the Borough's motion for summary judgment at docket 61 is GRANTED.

DATED this 14th day of November, 2013.

/s/
JOHN W. SEDWICK
UNITED STATES DISTRICT JUDGE